UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEXANDER WILLIAMS, JR.,
                                    Plaintiff,

                    -v-

CITY OF NEW YORK, *et al.*,
                                    Defendants.

23-CV-2700 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Alexander Williams, Jr. brings this action asserting claims for unlawful conditions of confinement, denial of access to counsel, and retaliation for protected speech while he was a pretrial detainee at the George R. Vierno Center ("GRVC") on Rikers Island. Before the Court is Defendants' joint motion to dismiss all counts pursuant Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 31.) For the reasons that follow, the motion to dismiss is granted in part and denied in part.

I.      **Background**

The following facts are drawn from Plaintiff's Amended Complaint, (ECF No. 7 ("AC"))[1] and are presumed true for purposes of this opinion. All reasonable inferences are drawn in Plaintiff's favor. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

        A.      **The Judicial Lockdown and Command Level Orders**

On January 18, 2023, Judge Vincent Del Giudice of the New York Supreme Court entered a Judicial Lockdown Order ("JLO"), finding that Plaintiff had threatened witnesses and engaged in other concerning conduct, and mandating that Plaintiff be subject to restricted

_____

[1] Because the Amended Complaint is not paginated, this opinion refers to paragraphs where possible, and otherwise refers to the page of the filed PDF document.

housing and visitation. (AC at 80-82 (Exhibit K).) Specifically, the JLO required that Plaintiff "be housed in a highly secure area . . . on a 23 hour lock-in status daily," "be separated from all other inmates," be "barred from having any visits other than with his attorney[s] . . . or his investigators," and be "precluded from making any telephone calls other than to his attorney[s] . . . or his investigators." (*Id.*)

The JLO was implemented via a generic Command Level Order ("CLO") authorized by the Warden and effective since July 19, 2021. (AC at 36-42 (Exhibit A).) The CLO serves to "establish policy and procedures for the Care, Custody and Control of the inmates under Court Order lockdown status." (*Id.* at 37.) Regarding general procedures, the CLO requires 23-hour "lock-in, feed-in status," and restricts the property that inmates are "allowed to possess . . . in their cell." (*Id.*) Regarding security, the CLO requires that only one inmate subject to lockdown "be allowed out of his cell at any one time," that inmates "be restrained in leg irons, wrist chains and mitts," that inmates be regularly strip searched, and that inmates "not be permitted to refuse to attend court because of complaints of health problems unless the physician examine [sic] this defendant certifies in writing that the attendance . . . would likely result in serious impairment to . . . health." (*Id.* at 38.) Regarding outside contact, the CLO bars inmates "from Visits and Telephone calls to anyone other than their attorney of record." (*Id.* at 39.) And, regarding "Medical/Mental Health Services," the CLO provides that "[a]ny necessary medical or mental health services are to be provided to these inmates in the housing area," and that "[t]hey will not be removed to go to the Clinic unless it is physically impossible to provide them with necessary medical services in the cell/housing area." (*Id.* at 40.) The CLO provides for hospitalization at Bellevue Hospital in the event of a "medical emergency." (*Id.* at 41.)

After the JLO was issued on January 18, 2023, the Deputy Warden of GVRC (Defendant Matos) issued a "Security Memorandum" applying the general terms of the 2021 CLO to four inmates, including Plaintiff.  (AC at 74 (Exhibit L) ("Memorandum").)  That Memorandum determined that Plaintiff was "[p]rohibited form [sic] having any visits other than his attorney[s] . . . or his investigators . . . ."  (*Id.*)

### B.    Plaintiff's Medical Concerns

Plaintiff details a variety of medical concerns.  They include: a painful condition affecting his left foot for which he has received physical therapy and for which a GRVC doctor recommended surgery (AC ¶¶ 37, 39); rectal pain due to hemorrhoids for which he was due to receive corrective surgery (AC ¶¶ 5-6); mental health issues including depression and thoughts of suicide (AC at 101 (Exhibit T)); and an acute reaction to exposure to "[c]hemical agents" after a nearby inmate was sprayed with pepper spray (AC ¶¶ 7, 9-14).  Plaintiff alleges that he was denied treatment for all of these conditions.  (AC ¶ 6 (denial of access to routine care); ¶¶ 7-14 (chemical exposure incident).)

### C.    Plaintiff's Concerns Related to Access to Legal Counsel

Although the Security Memorandum expressly permitted Plaintiff to receive visits from his attorneys, Plaintiff alleges that he was prevented from communicating with them.  (*See, e.g.*, AC ¶¶ 21, 22, 26.)  For example, Plaintiff alleges that a scheduled video visit on March 1, 2023 with his counsel was cut short after five minutes, and that Defendant Lindsey-Smith stated to him "I [don't] have to make sure you see your attorney[s]."  (AC ¶ 29.)  Plaintiff alleges that on March 9, 2023, he requested a call with his counsel in order to "prepare in his [m]urder trial," but that Defendant Matos responded that she did not "give a fuck about your attorney and your trial outcome you sued me and published a book about my facility" before denying his request. (AC ¶ 27.)  On March 15, 2023, Plaintiff alleges, Defendant Griffin told him that he would not

allow Plaintiff to speak with his attorneys until after he was convicted because "plaintiff had named him in a lawsuit."  (AC ¶ 31.)  Plaintiff alleges that these denials induced him to ask his attorneys to settle his pending criminal case "because he was [afraid] that the restriction on the communication with these attorney[s] [was] placing a [substantial] amount of burden on his matters [and] would end in an unfavorable manner."  (AC ¶ 26.)

> ### D.    Plaintiff's Concerns Related to Religious Observance

Plaintiff alleges in the Amended Complaint that he is a "Known Jewish Observer" who was prohibited from practicing his faith due to the CLO.  However, Plaintiff expressly abandons these claims in his Opposition to the Motion to Dismiss.  (ECF No. 37 ("Opp.") at 16.)[2]

## II.    Legal Standards

> ### A.    Motion to Dismiss Under Rule 12(b)(6)

Rule 12(b)(6) authorizes a district court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  To survive a motion to dismiss for failure to state a claim, a complainant must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This means that a complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  A complaint is also properly dismissed "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.  Plaintiff must also

---

[2] As with the Amended Complaint, the Opposition is not paginated.  This opinion accordingly refers to the page of the filed PDF document.

make "specific factual allegations against the individual defendants," and may not "rely on group pleading." *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 723 n.4 (S.D.N.Y. 2012).

In assessing the sufficiency of the complaint, a court may consider "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir.2004) (citations and internal quotation marks omitted). "Integral" documents are those "either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993)). In order for a document to be "integral," however, a plaintiff must actually have relied on its terms and effect in drafting the complaint; mere possession or notice is not enough. *Id*.

Plaintiff is proceeding *pro se*. "It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020). "Nonetheless, a *pro se* complaint must state a plausible claim for relief." *Id*. "In pro se cases, a court may consider new allegations raised by the plaintiff in opposition to a motion to dismiss." *Rodriguez v. Rodriguez*, No. 10-CV-891, 2013 WL 4779639, at *1 (S.D.N.Y. July 8, 2013) (collecting cases).

**B.      Qualified Immunity**

"Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995). "Government actors performing discretionary functions are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id*. (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The objective reasonableness test is met—and the

defendant is entitled to immunity—if 'officers of reasonable competence could disagree' on the

legality of the defendant's actions."  *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The doctrine "protects all but the plainly incompetent or those who knowingly violate the law."

*City of Tahlequah*, 142 S. Ct. 9, 11 (2021) (quoting *District of Columbia v. Wesby*, 138 S. Ct.

577, 589 (2018)) (quotation marks omitted).  "Only Supreme Court and Second Circuit

precedent existing at the time of the alleged violation is relevant in deciding whether a right is

clearly established."  *Torcivia v. Suffolk Cty., New York*, 17 F.4th 342, 367 (2d Cir. 2021).  "[I]f

a reasonable officer might not have known for certain that the conduct was unlawful—then the

officer is immune from liability."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

"Qualified immunity is an affirmative defense, on which the defendant officials bear the

burden of proof."  *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012).  While qualified

immunity may be successfully asserted on a motion to dismiss . . . the defense faces a formidable

hurdle at the pleading stage."  *Horn v. Stephenson*, 11 F.4th 163, 169–70 (2d Cir. 2021) (internal

quotation marks omitted).  To carry its burden, a defendant must show that "the facts supporting

the defense appear on the face of the complaint," and that "it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  *Brown

v. Halpin*, 885 F.3d 111, 117 (2d Cir. 2018) (internal quotation marks omitted).  "[T]he plaintiff

is entitled to all reasonable inferences from the facts alleged, not only those that support his

claim, but also those that defeat the immunity defense."  *McKenna v. Wright*, 386 F.3d 432, 436

(2d Cir. 2004).

## III.    Discussion

Plaintiff asserts fourteen distinct causes of action in the Amended Complaint.  The Court

construes the first, second, third, sixth, ninth, and tenth causes of action as individual liability

claims under 42 U.S.C. § 1983 ("Section 1983"); the fourth and fifth causes of action as municipal liability claims under Section 1983; the seventh, eighth, eleventh, and thirteenth causes of action as New York common law tort claims; and the twelfth cause of action as a constitutional tort claim under New York common law, based on the New York Constitution. The fourteenth cause of action alleges violations of 42 U.S.C. §§ 1985-86.

### A.    Individual Claims Under Section 1983

To state a claim under Section 1983, a plaintiff must "allege that '(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States.'" *Flynn v. James*, 513 F. App'x 37, 39 (2d Cir. 2013) (summary order) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999)); *see also Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988). "[A]cts of officers in the ambit of their personal pursuits are plainly excluded." *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994) (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)) (internal quotation marks omitted). Section 1983 does not create any independent substantive rights but rather is a vehicle to "redress . . . the deprivation of [federal] rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999).

To sustain a Section 1983 action against an individual defendant, a "plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (requiring "personal participation by one who has knowledge of the facts that rendered the conduct illegal"). Conversely, "a supervisor's mere knowledge" is an insufficient basis for individual liability under Section 1983, *Bellamy v. Mount*

*Vernon Hosp.*, No. 07-CV-1801, 2009 WL 1835939, at *4 (S.D.N.Y. June 26, 2009), *aff'd*, 387
F. App'x 55 (2d Cir. 2010) (summary order) (quoting *Iqbal*, 556 U.S. at 677), though a
"persistent failure to supervise or discipline" can be a basis for municipal liability, *House v. City
of New York*, No. 18-CV-6693, 2020 WL 6891830, at *19 (S.D.N.Y. Nov. 24, 2020).

### 1.    Conditions of Confinement

The Court construes Plaintiff's claims regarding denial of adequate medical care as a
Section 1983 claim for unconstitutional conditions of confinement.  As a pretrial detainee in state
custody, Plaintiff's "claims of unconstitutional conditions of confinement are governed by the
Due Process Clause of the Fourteenth Amendment."  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir.
2017).  Plaintiff "may establish a § 1983 claim for allegedly unconstitutional conditions of
confinement by showing that the officers acted with deliberate indifference to the challenged
conditions."  *Id.*  That requires showing both that "challenged conditions were sufficiently
serious to constitute objective deprivations of the right to due process"—an "objective prong"—
and that Defendants "acted with at least deliberate indifference to the challenged conditions"—a
"subjective prong."  *Id.*  "Deliberate indifference" is roughly akin to "recklessness" in either the
subjective ("what a person actually knew, and disregarded") or objective ("what a reasonable
person . . . should have known") sense.  *Id.*

Plaintiff has four overarching denial of care claims.  First, he alleges that he has a
preexisting "deformity" of his left foot, that the condition has been recognized by facility
clinicians, and that lack of care has led to worsening pain.  (AC ¶¶ 37, 39.)  Although he was
previously receiving physical therapy, he alleges that he was not produced to "30 plus physical
therapy appointments" (AC at 50 (Exhibit E)), for a period of "over 24 months" (AC at 101
(Exhibit T)).  In a grievance form dated March 20, 2023, Plaintiff stated that this lack of physical
therapy caused him to become "unable to place any substantial amount of weight on the [foot]

which has caused great pain that is unbearable," and that this "has caused [him] to become mental[ly] depressed" and suicidal.  (*Id.*)  When he was eventually seen in the facility clinic in March 2023, Plaintiff alleges that the examining doctor determined that his condition had worsened so severely that it required surgery.  (*Id.* ¶ 39.)

With respect to the objective prong of the denial-of-care standard, Plaintiff alleges a sufficiently serious harm to be unconstitutional.  A serious medical condition exists where "failure to treat . . . could result in further significant injury or the unnecessary and wanton infliction of pain."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quotation marks omitted).  "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  *Id.* (quotation marks and brackets omitted).[3]  Here, Plaintiff alleges that failure to treat his foot caused him serious pain, along with an unnecessary worsening of his condition.  He also alleges that an examining physician concluded that the condition eventually became serious enough to warrant surgery.  This is sufficient to state a valid claim.

---

[3] Although this standard formally applies to claims brought under the Eighth Amendment, the Second Circuit has applied it on multiple occasions in the Fourteenth Amendment context as well.  *See, e.g.*, *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019) (civil immigration detainee); *Mills v. Fenger*, 216 F. App'x 7, 10 (2d Cir. 2006) (summary order) (criminal detainee); *Shenk v. Cattaraugus Cnty.*, 305 F. App'x 751, 753 (2d Cir. 2009) (summary order) (criminal detainee).  As it appears the Supreme Court has not articulated a lesser standard for objective seriousness in Fourteenth Amendment context, and because the Court "do[es] not think that the outcome depends on which standard applies," the Court applies the factors noted above.  *Cf. Shenk*, 305 F. App'x at 752.

Plaintiff does not generally plead the personal involvement of any Defendant in specific denials of access to the facility clinic.[4]  Rather, he asserts that the CLO itself barred him from visiting the facility clinic, and therefore from receiving treatment.  (AC ¶ 3, 19, 39.)  The only individuals alleged to have had a direct role in issuing the CLO are Defendants Cort and Matos.  Defendant Matos allegedly "signed and endorsed [the CLO] acknowledging and ordering the enforcement of such, giving her direct involvement . . . ."  (Opp. at 4 (cleaned up).)  Both Defendants Cort and Matos were allegedly "directly responsible" for the housing unit governed by the CLO (*id.*), which "clearly ties the CLO directly to [them] (*id.* at 5).  Both also allegedly enforced the CLO and disciplined lower-level officers who deviated from its requirements.  (*Id.* at 4.)  Defendants do not appear to dispute this characterization, acknowledging that "[t]he Warden . . . issued a corresponding Command Level Order . . . implementing the terms of the JLO."  (ECF No. 32 ("MoL") at 10.)  The Court therefore dismisses Plaintiff's Section 1983 claims relating to his foot against all individual Defendants except Cort and Matos.[5]

Second, Plaintiff alleges that he has rectal pain due to hemorrhoids and was denied a medically necessary surgery.  (AC ¶¶ 5-6; *see also* AC at 48 ("Exhibit D") (alleging that medical made "numerous" appointments for "surgeries with rectal doctors that DOC officials have not produced me to").)  This led to pain and "[b]leeding on numerous occasion[s] from the rectal areas leading to medical emergencies."  (AC ¶ 19.)

---

[4] With the exception of Defendant Phillips.  *See infra* pp. 11-12.

[5] Because a supervisor's mere awareness of a violation is not enough for individual liability under Section 1983, Matos's supervisor, Griffin, is not liable here.  *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).  While Griffin allegedly played a more direct role in Mr. Williams' lack of access to counsel, *see infra* Section III.A.2, he is at most alleged to have been aware of Mr. Williams' various medical complaints.

As with Plaintiff's foot, Plaintiff's rectal injury is sufficiently serious to be cognizable under Section 1983.  Plaintiff also adequately links the worsening of his condition to the denial of access to the facility clinic, which stemmed from the CLO.  Plaintiff has thus stated a claim for individual liability against Defendants Cort and Matos.  Plaintiff's Section 1983 claims relating to his rectal pain are dismissed against all other individual Defendants.

Third, Plaintiff claims that he was not produced to "mental health bi-weekly sessions" and "mental health [appointments]" (AC ¶ 6), and that his "mental health clinician [was] forced to meet with me in housing unit" rather than the facility clinic (AC at 50 (Exhibit E)).  Plaintiff alleges that, as a result, he became depressed and suicidal.  (AC at 101 (Exhibit T).)

Plaintiff's claims, again, are sufficiently serious.  *See Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir.1989) ("We think it plain that from the legal standpoint [that] psychiatric or mental health care is an integral part of medical care" and "must be provided to prisoners"); *Allah v. Kemp*, No. 08-CV-1008, 2010 WL 5860290, at *8–9 (N.D.N.Y. Nov. 9, 2010), *adopted in full*, 2011 WL 705210 (N.D.N.Y. Feb. 22, 2011) (rejecting a qualified immunity argument "in [the] inmate suicide context").  As before, Plaintiff's allegations stem from the CLO, so only Defendants Cort and Matos are liable.  Plaintiff's Section 1983 claims related to his mental health appointments are therefore dismissed as to the other individual Defendants.

Fourth, Plaintiff alleges that he experienced complications following accidental contact with pepper spray, and that Defendants failed to provide him adequate treatment.  (AC ¶¶ 7-14.) Specifically, he was exposed to "[c]hemical agents . . . when another inmate was sprayed" by an unnamed "correction official."  (*Id.* ¶ 7.)  He informed an Officer Wolonski that he was allergic to the chemical and showed Wolonski "at his cell door that he was coughing up blood and unable to breathe."  (AC ¶ 9.)  Wolonski then "attempted to assist" Plaintiff by calling for help, but

afterwards informed Plaintiff that the "tour commander . . . did not want Plaintiff to receive medical care because he had published a book about Rikers Island and her co-worker . . . ." (AC ¶ 12 (cleaned up).)  Plaintiff alleges that this denial of care violated Department of Corrections and Community Supervision ("DOCCS") rules and regulations, including a directive specifying that individuals exposed to chemical agents must be brought outside into fresh air or be placed in front of a fan.  (AC ¶ 9.)  Although Plaintiff initially identified the supervisor who ordered the treatment denial as Jane/John Doe in the Amended Complaint, the officers on duty at the time of the spraying incident were later identified as ADW Chanele Henry, Captain Jimmy Guan, and ADW Denise Phillips.  (ECF No. 20 ("August 25, 2023 Letter").)  In his Reply, Plaintiff alleges that Defendant Phillips is the one who made the allegedly retaliatory statements to Officer Wolonski.  (Opp. at 5.)  The Court accordingly dismisses the claims against Defendants Henry and Guan.

Plaintiff has adequately pleaded a Fourteenth Amendment violation as to Defendant Phillips regarding the pepper spray incident.  Again, the alleged conduct is sufficiently serious, involving severe pain, coughing blood, and vomiting.  Plaintiff has also alleged sufficient detail for the Court to reasonably infer that his account is true, and that Defendant Phillips demonstrated deliberate indifference when she instructed care be withheld in retaliation for Plaintiff's prior speech.[6]  *Iqbal*, 556 U.S. at 678.  And, accepting Plaintiff's allegations that DOC rules and regulations required medical treatment, Defendants cannot establish as a matter of law that they would have taken the same course of action in the absence of retaliatory intent.

---

[6] Defendants respond that "Plaintiff only alleges that at the particular time he made the request the cell door could not be opened because CO Wolonski was waiting on instructions from security," but do not acknowledge Plaintiff's allegations of retaliatory intent.

Unlike the first two medical claims, Plaintiff does not allege that this failure to treat stemmed from the CLO, instead linking it solely to Phillip's retaliatory conduct.  (*See* AC ¶ 12; Opp. at 5-6.)  Plaintiff's Section 1983 claims related to the pepper spray incident are therefore dismissed as to all individual Defendants except Phillips.

Defendants do not specifically apply the general qualified immunity defense to Plaintiff's medical claims.  Regardless, a prisoner's right to be free from deliberate indifference to his serious medical needs has long been clearly established.  *See Darnell v. Pineiro,* 849 F.3d 17, 30 (2d Cir. 2017) ("Under both the Eighth and Fourteenth Amendments . . . prisoners may not be deprived of . . . medical care."); *see also Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) ("[T]he [Eighth] Amendment proscribes more than physically barbarous punishments . . . . [Supreme Court precedents] establish the government's obligation to provide medical care for those whom it is punishing by incarceration.").[7]  In addition, "[w]hile clearly established law should not be defined at a high level of generality for purposes of qualified immunity analysis, it is error to demand the specificity of a factual twin."  *Soukaneh v. Andrzejewski*, No. 21-2047, 2024 WL 3747703, at *10 (2d Cir. Aug. 12, 2024) (internal quotation marks and brackets omitted).  "[T]he absence of legal precedent addressing an identical factual scenario does not necessarily yield a conclusion that the law is not clearly established because the absence of a reported case with similar facts could demonstrate nothing more than widespread compliance with the well-recognized applications of the right at issue on the part of government actors."  *Id.* (internal quotation marks and brackets omitted).  Here, the well-established nature of the right to adequate medical care, combined with the objectively severe nature of Plaintiff's alleged ailments, allows

---

[7]"[T]he due process rights of a person in [Plaintiff's] situation are at least as great as the Eighth Amendment protections available to a convicted prisoner."  *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).

the Court to infer that reasonable officers should have known that denying Plaintiff the necessary care was unconstitutional, and that there was no reasonable institutional purpose for doing so.

Defendants argue that they were acting pursuant to a valid JLO and CLO.  (MoL at 13.).  "Although it is true that low-level employees have been granted qualified immunity where they followed orders promulgated by their superiors," *Sorensen v. City of New York*, 42 F. App'x 507, 511 (2d Cir. 2002) (summary order), that is not the case here.  Rather, Plaintiff's claims based on the CLO lie only against Defendants Cort and Matos, who are the supervisors responsible for promulgating and enforcing the CLO.  While the CLO is an implementation of the JLO, the unconstitutional conduct that Plaintiff alleges consists of deviations from or expansions of the JLO, which does not direct any withholding of medical care.  Plaintiff therefore has a plausible argument that the CLO is not facially valid with respect to his medical care.  Defendants also point to no language in either order that would justify Defendant Phillips' failure to treat Plaintiff after he was pepper sprayed.  Thus, qualified immunity protects neither Defendant Matos nor Defendant Phillips here.

### 2.    First Amendment Retaliation

Plaintiff next alleges various forms of retaliation against him for protected speech.  "[O]therwise constitutional acts may be actionable if taken in retaliation for the exercise of First Amendment rights."  *Soto v. Iacavino*, No. 01-CV-5850, 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003).  A plaintiff asserting such claims must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir.2004)).  "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim

of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir.2001)).

Plaintiff alleges two forms of retaliation.  First, Plaintiff adequately states a claim based on the pepper spray incident.  *See supra* pp. 11-12.  Plaintiff alleges, based on Officer Wolonski's statements, that Defendant Phillips denied his request to be removed from his cell after being sprayed in retaliation for publishing a book that named her.  *Id.*  Publishing a book is clearly protected speech.  *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105 (1991).  While it is true that prisoners have limited constitutional liberties, "[a] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Burns v. Martuscello*, 890 F.3d 77, 86 (2d Cir. 2018) (quoting *Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004)).  Defendants here claim no such legitimate objection to Plaintiff's book.  Defendants offer no alternative explanation for why he was not promptly removed from his cell,[8] and Plaintiff alleges that the failure to do so was in violation of governing DOC policies.  Plaintiff also adequately alleges harm, stating that the denial of treatment after being pepper sprayed caused him to experience severe pain, vomit, and cough up blood.

Second, Plaintiff alleges that he was denied access to both civil and criminal counsel in retaliation for previous lawsuits and grievances he filed against Defendants and DOC. (AC ¶¶ 21, 24.)  To support this, Plaintiff attached to his Complaint copies of grievance letters filed since February 2023.  (*See* AC at 92 ("Exhibit P"); AC at 88 ("Exhibit N"); AC at 85 ("Exhibit M"); AC at 87 ("Exhibit N").)  Plaintiff also alleges that defendants Lindsey-Smith,

---

[8] Defendants respond that "Plaintiff only alleges that at the particular time he made the request the cell door could not be opened because CO Wolonski was waiting on instructions from security" (MoL at 11) but do not acknowledge Plaintiff's allegations of retaliatory intent.

Matos, and Griffin all made statements to Plaintiff that restrictions on contact with counsel were imposed in retaliation for Plaintiff's civil lawsuits against the City and Department of Corrections.  (AC ¶ 21.)  For example, Plaintiff alleges that Defendant Matos told him "I don't give a fuck about your attorney and your trial outcome you sued me and published a book about my facility . . . ."  (AC ¶ 27 (capitalization altered).)  Plaintiff alleges that Defendant Lindsey-Smith told him "I don['t ]have to make sure you see your attorney[s]."  (AC ¶ 29 (capitalization altered).)  Plaintiff also alleges that Defendant Lindsey-Smith denied Plaintiff's request to speak with his civil attorneys and stated, "I will not allow you to go and call the same people who . . . are utilizing the courts to sue my officers."  (AC ¶ 30 (cleaned up).)  Plaintiff alleges that Lindsey-Smith implicated Defendant Rivera, telling Plaintiff that "he would never speak to his attorneys via telephone as long as she was the admin captain," and that "DW Rivera co-signed any call she made."[9]  (AC ¶ 35 (cleaned up).)  Finally, Plaintiff alleges that, while in the presence of Defendant Cort, Defendant Griffin told him that he was aware of Plaintiff's grievance letters regarding access to counsel, and that "he was going to make it his business to make sure I never speak to [my] attorney until after [I am sentenced to life in prison]." (AC ¶ 31.)

---

[9] Plaintiff also alleges at various points in the Complaint that his classification as requiring "Captain escort" when outside of his cell was unconstitutional because it was done without a "due process hearing."  AC ¶ 18-19.  While Plaintiff alleges that the implementation of the classification was excessively harsh and that this was retaliatory in nature, he does not allege that the classification itself was retaliatory.  Defendants correctly note that the classification was pursuant to facially valid lockdown orders, and thus served a legitimate penological purpose.  Pretrial detainees also lack a liberty interest in judicial process prior to the imposition of heighted security classification.  *See Pugliese v. Nelson*, 617 F.2d 916, 925 (2d Cir. 1980) ("[J]udicial intervention into the classification of prisoners for monitoring and control purposes would almost inevitably involve the federal courts in the day-to-day operations of our prison system, which are better left to the expertise of prison administration authorities.").  Plaintiff has thus not stated a substantive or procedural due process claim based on his classification as requiring an escort.

As with publishing a book, "it is well established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996)). Based on the statements recounted in the Complaint, Plaintiff has adequately pleaded retaliatory intent. And, because a valid Memorandum implementing the CLO granted Plaintiff the right to speak with his lawyers, Defendants cannot assert an alternate institutional purpose for denying him access. In any event, "the non-retaliatory justifications for the defendants' actions are insufficient to dismiss his claim," and at "this early state of the proceedings, he should have the opportunity to develop facts to demonstrate his claim." *Kotler v. Boley*, No. 21-1630, 2022 WL 4589678, at *3 (2d Cir. Sept. 30, 2022) (summary order) (internal quotation marks omitted).

Plaintiff adequately alleges the personal involvement of Defendants Lindsey-Smith, Matos, and Griffin based on express statements of retaliatory purpose, involvement of Defendant Rivera based on the allegation that she co-signed Lindsey-Smith's denials of access, and involvement of Defendant Cort based on her alleged presence when Griffin's retaliatory statements were made. (*Cf.* MoL at 21-22.) Conversely, while Plaintiff alleges that Defendant Molina was made aware of Plaintiff's allegations through letters sent by Plaintiff's attorneys, mere awareness is insufficient to state a claim for supervisory liability under Section 1983. Plaintiff's Section 1983 claims based on First Amendment retaliation are therefore dismissed against all individual defendants except Defendants Phillips, Griffin, Cort, Matos, Lindsey-Smith, and Rivera.

Defendants do not address Plaintiff's retaliation claims in their discussion of qualified immunity, nor do they ask the Court to apply any heightened pleading standards to Plaintiff's allegations of improper intent. In any event, higher standards are inappropriate where, as here, the alleged intent is an element of the constitutional violation, and the constitutional violation is clearly established. *See Crawford-El v. Britton*, 523 U.S. 574, 593 (1998).

### 3. Sixth Amendment

Plaintiff also brings his access-to-counsel claims under the Sixth Amendment, which guarantees the "right of a pretrial detainee, in a case brought against him by the state, to utilize counsel in his defense." *Benjamin v. Fraser*, 264 F.3d 175, 186 (2d Cir. 2001). By its terms, the Sixth Amendment protects access to only criminal defense counsel, not civil counsel that a detainee might be utilizing in other legal matters, even if those matters relate to the conditions of his confinement. *Id.* ("[D]etainees need access to the courts and counsel is not to present claims to the courts, but to defend against the charges brought against them."). Detainees must have a "reasonable opportunity to seek and receive the assistance of attorneys," and "[r]egulations and practices" must not "unjustifiably obstruct the availability of professional representation." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989). While detainees are not entitled to unlimited phone calls to counsel at any time of day, restrictions on such communications "must be reasonably necessary to address . . . legitimate penological concerns." *Anduze v. City of New York*, No. 21-CV-519, 2022 WL 4586967, at *12 (S.D.N.Y. Aug. 8, 2022), *adopted in full in* 2022 WL 4547420 (Sept. 29, 2022). When restrictions are imposed on a detainee's access to counsel, "the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

Applying *Procunier* and *Bell*, the Second Circuit has held that restrictions on access to counsel must have a "reasonable relationship" to the institutional interests served and must be reasonable in light of available alternatives. *Benjamin*, 264 F.3d at 187-88. Importantly, Plaintiff needs not demonstrate "actual injury" to adequately plead a Sixth Amendment violation. *Id*. at 187-88 (collecting cases).[10]

Here, Plaintiff alleges that he was prevented from communicating with criminal defense counsel beginning on January 18, 2023. (AC ¶ 21.) Plaintiff, as already noted, alleges that such restrictions were motivated by retaliatory intent on the part of Defendants Lindsey-Smith, Matos, Griffin, Cort, and Rivera. *See supra* pages 14-17. Defendants respond that Plaintiff's account of the statements made to him by Defendants is "conclusory," and that there is no "right to unrestricted phone use." (MoL at 6.) Defendants also argue that, in light of the JLO, the restrictions on Plaintiff's access to counsel had the legitimate penological purpose of ensuring that he was "not threatening or intimidating witnesses." (*Id.*)

The Court views Plaintiff's account as sufficiently detailed to state a claim at this early stage in the proceedings. The alleged statements of retaliatory purpose and the fact that the restrictions were in conflict with the Security Memorandum allow an inference that the restrictions were substantively unreasonable. Plaintiff adequately alleges the personal

---

[10] Defendants do not raise, but the Court notes, that *Heck v. Humphrey*, 512 U.S. 477 (1994), may apply to Plaintiff's Sixth Amendment claims, insofar as they impugn the validity of his conviction. *See, e.g.*, *Zarro v. Spitzer*, 274 F. App'x 31, 34-35 (2d Cir. 2008) (summary order) (affirming dismissal of a Sixth Amendment access-to-counsel claim because it "would necessarily impugn the validity of Plaintiff's conviction"). However, while the Court observes that *Heck* may bar Plaintiff from seeking damages that stem from the fact of his guilty plea or the duration of his conviction, *cf.* AC ¶ 26, the availability of *at least* nominal damages here means the Court "need not consider at this stage of the proceedings whether any of Plaintiff's incarceration-based damages are *Heck*-barred." *Poventud v. City of New York*, 750 F.3d 121, 136 n.18 (2d Cir. 2014); *see also Anduze*, 2022 WL 4586967, at *12-13 (declining to dismiss similar Sixth Amendment claims where defendants did not raise *Heck*).

involvement of Defendants Lindsey-Smith, Matos, Griffin, Rivera, and Cort based on their express or adopted retaliatory statements.  His Section 1983 claims based on the Sixth Amendment are dismissed against the other individual Defendants.

Defendants claim entitlement to qualified immunity, both because the denial of access to counsel falls in a "grey area" rather than being clearly unconstitutional, and because their actions were taken pursuant to a "facially valid directive."  (*Id. at* 13.)  Here, however, Plaintiff alleges that the denials of access to counsel were in conflict with such directives, including the JLO, CLO, and Security Memorandum.  (AC ¶ 20 ("[Defendants] were in contempt of the . . . court order issue[d] by [Judge] Vincent Del-Giudice"); *id.* at 15 (Third Cause of Action) ("Defendants purposefully engaged in conduct that was adverse to Plaintiff's updated Court Order." (cleaned up)).)  Plaintiff also alleges that the denials were retaliatory in nature.  It is clearly established that restrictions on access to counsel must be reasonable in light of a legitimate institutional goal, and that retaliation is not such a goal.  *Bell*, 441 U.S. at 547.  Nor have Defendants articulated any other legitimate institutional goal plausibly served by the denials.  Defendants have thus not pointed to facts in the pleadings that support the application of qualified immunity here, nor have they demonstrated a sufficient level of certainty that Plaintiff cannot later prove facts that would defeat the defense.

### 4.    Equal Protection

Plaintiff asserts an equal protection claim based on the additional restrictions imposed on him relative to "inmates . . . who are not court order lockdown inmates."  (AC at 22 (Tenth Cause of Action) (cleaned up).)  To state a claim under the Equal Protection Clause, Plaintiff must allege "facts indicating either that he was 'selectively treated' as 'compared with others similarly situated' or that 'such selective treatment was based on impermissible considerations.'"  *Brown v. City of New York*, No. 18-CV-3287, 2020 WL 1819880, at *3 (S.D.N.Y. Apr. 9, 2020)

(quoting *LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994)). If, as here, a plaintiff does not allege membership in a protected class, he can still prevail in a class of one equal protection claim by showing that he was "intentionally treated differently from other similarly[]situated individuals without any rational basis." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir.2006). For prisoners, a disparity in treatment is unconstitutional only if it is "not reasonably related to any legitimate penological interests." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir.2005).

Plaintiff does not allege that he was treated differently from *similarly situated* inmates, but rather that all inmates subject to lockdown orders were subject to the same restrictions. In addition, Defendants had a legitimate institutional reason to treat Plaintiff differently than non-lockdown inmates—namely, the JLO ordering that they do so. The Court therefore grants the motion to dismiss as to Plaintiff's equal protection claim.

### B.    Municipal Liability Under Section 1983

To plead liability under Section 1983, a plaintiff must plausibly allege: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks and citation omitted). To allege an official policy in satisfaction of the first element, a plaintiff must plead facts supporting a plausible inference that the constitutional violation "took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." *Missel v. Cnty. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (summary order). A plaintiff may alternatively plead "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware" or "a failure by policymakers to provide adequate training or supervision to subordinates

to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015) (quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010)).

Plaintiff alleges two bases for municipal liability here. First, he claims that the CLO itself is an official policy.[11] (*See, e.g.*, AC ¶ 17 ("[T]he CLO that governs court order lockdown . . . is to blame . . . which would leave liable defendant City . . . ." (cleaned up)).) When alleging an official policy, "a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." *Missel*, 351 F. App'x at 545. Bare allegations of a policy are insufficient; rather, a plaintiff must plead "facts suggesting the policy's existence." *Id*. That said, "[e]ven a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered may deprive the plaintiff of his or her constitutional rights." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 403 (2d Cir. 2018) (internal quotation marks omitted).

The Court is satisfied for now that the CLO qualifies as "a formal policy which is officially endorsed by the municipality." *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015) (summary order). Although brief, Plaintiff's filings do allege that the promulgation and enforcement of the CLO was an official policy. (Opp. at 5.) While some courts have questioned whether discrete actions by wardens qualify as policies, *Anduze*, 2022

---

[11] Defendants mistakenly argue that "Plaintiff does not even mention or refer to the existence of any policy, practice, or custom." MoL at 18.

WL 4586967, at *21 (collecting cases), the key question appears to be whether the individual in question possesses "final" policymaking authority regarding the challenged conduct, *see, e.g.*, *id.* (accepting the warden's policymaker status at the motion to dismiss stage); *Graham v. City of New York*, No. 05-CV-5428, 2009 WL 909620, at *2 (E.D.N.Y. Mar. 31, 2009) (calling for more evidence on the question); *Joseph v. City of New York*, No. 20-CV-1676, 2020 WL 3129159, at *2 (E.D.N.Y. June 12, 2020) (dismissing for lack of alleged facts showing that the warden was "the final policymaking authority for inmate complaints"). Here, Deputy Warden Matos and Warden Cort promulgated a CLO that Plaintiff alleges, and Defendants acknowledge, was binding throughout the facility, and pertained to numerous inmates. (*See* AC ¶ 17 (alleging that the CLO "governs" the lockdown unit); MoL at 13 (arguing that officers were acting "at the direction of a facially valid directive – in this case the CLO").) Although the factual record is incomplete on this question, Plaintiff's allegations are sufficient to support a reasonable inference that Defendants Matos and Cort were acting as policymakers at this stage in the proceedings.

The City is thus potentially liable under Section 1983 for any constitutional violations that were caused by the CLO. As explained above, the CLO (and interpretive Memorandum) implemented an official policy of *granting* Plaintiff access to lawyers, and the alleged denials of access were instead due to retaliatory animus. Likewise, Plaintiff alleges that failure to treat his pepper spray injuries was a retaliatory act by Defendant Phillips, rather than based on the CLO. The City is therefore not liable for these claims. Plaintiff does, however, link his other medical claims to the CLO. Specifically, he alleges that he was denied physical therapy and surgery for his left foot, surgery for his rectal pain, and necessary mental health treatment, because, under the CLO, he was "not [] allowed to the facility clinic area for any reason [other than] an acute

emergency." (AC ¶ 1 (cleaned up).) The Court therefore declines to dismiss Plaintiff's claims against the City concerning his left foot, rectal injury, and mental health issues.

Plaintiff's second theory of municipal liability sounds in failure to train and supervise. "[A] municipality's persistent failure to train or supervise subordinates who violate civil rights could give rise to *Monell* liability if the severity of such failure rises to the level of deliberate indifference to a plaintiff's rights." *White v. City of New York*, No. 17-CV-2404, 2019 WL 1428438, at *3 (S.D.N.Y. Mar. 29, 2019) (quoting *Sarus v. Rotundo*, 831 F.2d 397, 401 (2d Cir. 1987)) (internal quotation marks and brackets omitted). Deliberate indifference requires that a municipal actor have "disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). This requirement can be satisfied if "city policymakers are on actual or constructive notice" that their failure to train or supervise is leading to violations of constitutional rights. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Plaintiff alleges that both Deputy Warden Matos and Warden Cort were actually aware that Plaintiff was being denied access to counsel in violation of the CLO and Memorandum. (Opp. at 8.) While wardens may or may not always be policymakers, Plaintiff here alleges that both Defendants Matos and Cort possessed the requisite authority for promulgating a CLO, and that they were responsible for supervising their subordinates to ensure that the CLO was being enforced. (Opp. at 4-5.) Plaintiff also alleges, and Defendants do not dispute, that Defendant Griffin told Plaintiff that he was aware of Plaintiff's complaints about access to counsel, and that he intended to deliberately continue to prevent Plaintiff from speaking with his attorneys in retaliation for his previous civil litigation. (AC ¶ 31.) Defendant Griffin is Assistant Commissioner of the Department of Corrections and Community Supervision (AC at 1), ranking

above Warden Cort (AC at 20 (Seventh Cause of Action)).  Plaintiff alleges that "a

comm[i]ssioner" "can create a policy [in] city jails and other prisons."  (Opp. at 5.)  Beyond

citations to inconclusive case law, Defendants do not articulate any reason why Defendants

Matos, Cort, or Griffin lacked policymaking authority in this context.  (MoL at 17-18.)

At this stage in the litigation, and in light of the liberal treatment of *pro se* pleadings, the

Court is satisfied that Plaintiff has sufficiently alleged that Defendants Matos, Cort, and Griffin

qualify as policymakers, and that they were deliberately indifferent to the retaliatory denial of

Plaintiff's access to counsel.  The Court therefore declines to dismiss Plaintiff's claims against

the City alleging denial of access to counsel in violation of the First and Sixth Amendments.[12]

Finally, regarding the pepper spray incident, Plaintiff does not allege that Defendant

Phillips was a municipal official, nor can the Court discern a reason to believe she had

policymaking authority.  Plaintiff does not allege that any other official was aware of or

indifferent to the incident.  The Court accordingly dismisses Plaintiff's Section 1983 claim

against the City relating to the pepper spray incident.

### C.    Individual Negligence

In addition to his federal claims, the Court construes Plaintiff as asserting a state-law

negligence claim for both denial of medical care and denial of access to his attorneys.  The Court

understands these claims as applying to all individual Defendants alleged to have personally

participated in or approved of such denials—that is, Defendants Lindsey-Smith, Matos, Cort,

Phillips, Rivera and Griffin.  Defendants respond only to a supposed claim for "negligent

training and supervision" and do not otherwise mention Plaintiff's ordinary individual

---

[12] Plaintiff also alleges that Defendant Molina was aware of his complaints.  The Court
need not reach that issue, since the other officials' alleged conduct is a sufficient basis for
municipal liability at this stage in the proceedings.

negligence claims. (*See* MoL at 16-17.) Defendants also decline to assert any state-law immunity, and their qualified immunity defense applies only to federal causes of action. *See Stein ex rel. Stein v. Barthelson*, 419 Fed. App'x 67, 71 (2d Cir. 2011) ("[T]he doctrine of qualified immunity applies to *federal* causes of action but is not generally understood to protect officials from claims based on state law." (internal quotation marks omitted)).[13] As the Court is satisfied that Plaintiff has met his burden of stating individual negligence claims against the listed Defendants, the Court declines to dismiss such claims *sua sponte*.[14]

### D. Intentional Infliction of Emotional Distress

Plaintiff also asserts state-law claims for intentional infliction of emotional distress (IIED) against all Defendants. Under New York law, the first element for such a claim is "extreme and outrageous conduct." *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993). The standard for this element is exacting: "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983) (quoting Restatement (Second) of Torts § 46, cmt. d). Indeed, the threshold for outrageousness is so demanding that, "of the intentional infliction of emotional distress claims considered by the [New York] Court of Appeals, 'every one has failed because the alleged conduct was not sufficiently outrageous.'" *Seltzer v. Bayer*, 709 N.Y.S.2d 21, 23 (App. Div. 1st Dep't 2000) (quoting *Howell*, 81 N.Y.2d at 122). The mere commission of torts—"constitutional or otherwise"—does not mean that

---

[13] New York common law grants an immunity similar to federal qualified immunity, *Stein*, 419 Fed. App'x at 71, but Defendants have not raised that defense here.

[14] While the Court is skeptical that some elements of Plaintiff's negligence claims would survive summary judgment, no special solicitude is due to counseled parties and dismissal would be inappropriate at this stage without briefing on the matter from Defendants.

conduct rises to the level of outrageousness necessary to qualify as IIED.  *Perez v. de la Cruz*, No. 09-CV-264, 2013 WL 2641432, at *11 (S.D.N.Y. June 12, 2013).

Although Defendants do not specifically address Plaintiff's IIED claims, under this standard, the denial of access to medical care alleged here is not sufficiently outrageous, atrocious, or intolerable to sustain the cause of action.  *See, e.g.*, *Vail v. City of New York*, No. 18-CV-9169, 2020 WL 127639, at *4 (S.D.N.Y. Jan. 10, 2020) (dismissing an IIED claim based on similar facts).  The same conclusion holds *a fortiori* for Plaintiff's claims regarding denial of access to counsel.  Plaintiff's IIED claims are therefore dismissed.

### E.    Vicarious Liability

Plaintiff asserts claims for negligent failure to train and supervise, and against the City under a theory of *respondeat superior*.  Plaintiff also asserts claims based on a *respondeat superior* theory against Defendants Griffin, Cort, and Matos, which the Court construes as vicarious liability claims for the negligent failure to supervise.[15]

### 1.    Negligent Failure to Train and Supervise

"To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the

---

[15] Plaintiff's eleventh cause of action is entitled "abuse of power."  (SAC at 23.)  The Court is unaware of any such tort under New York law, and, in any event, Plaintiff's description is indistinguishable from his claims for individual negligence and vicarious liability.  The Court therefore declines to construe the eleventh cause of action as raising independent claims.

employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (internal citations and quotation marks omitted).

Plaintiff alleges that the City failed to instruct the Defendant officers regarding the "importance of abiding by [the JLO]" and the importance of protecting detainees' rights "regardless of a detainee's record of civil litigation." (AC at 16 (Fourth Cause of Action) (cleaned up).) Plaintiff also alleges that the City was actually aware of improper restrictions on his access to counsel "in light of the complaints filed by the plaintiff." (AC at 17 (Fourth Cause of Action).) Defendants do not dispute that they were in fact employed by the City and that the conduct alleged occurred on City property.

Defendants argue that the alleged negligence must have been "an independent act of negligence outside the scope of employment." (MoL at 16-17 (quoting *House*, 2020 WL 6891830, at *21).) At the very least, Plaintiff's claims based on retaliatory animus meet this requirement. *See, e.g.*, *Degrafinreid v. Ricks*, 452 F. Supp. 2d 328, 334 (S.D.N.Y. 2006) ("New York and federal courts have on occasion found that the on-the-job conduct of DOCS employees was outside the scope of employment . . . [when] the conduct 'was prompted purely by personal reasons unrelated to the employer's interest . . . .'" (quoting *Ierardi v. Sisco*, 119 F.3d 183, 188 (2d Cir. 1997)).

Defendants also state without explanation that Plaintiff's claim is "conclusory" and "fail[s] to allege any facts about any relevant City training program and/or to allege a specific deficiency in that program." (MoL at 17.) The Court need not decide whether Plaintiff has pointed to any specific training program—rather, it is sufficient for now that the Amended Complaint adequately states a claim for failure to supervise based on Plaintiff's claims that

supervisors were actually aware of the alleged retaliation.  The Court therefore declines to dismiss Plaintiff's negligence claims against the City based on Defendants' retaliatory conduct.

**2.**    ***Respondeat Superior***

It is well settled that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). However, "[u]nlike cases brought under § 1983, municipalities may be liable for the common law torts, like false arrest and malicious prosecution, committed by their employees under the doctrine of *respondeat superior*."  *L.B. v. Town of Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002).  "No municipal custom or policy need be proven to establish the liability of the City for violation of that state law, for '[m]unicipalities surrendered their common-law tort immunity for the misfeasance of their officers and employees long ago.'"  *Lore v. City of Syracuse*, 670 F.3d 127, 168 (2d Cir. 2012) (alteration in original) (quoting *Tango v. Tulevech*, 61 N.Y.2d 34, 40 (1983)).  Unlike failure to supervise claims, "[u]nder the doctrine of *respondeat superior*, an 'employer may be liable . . . so long as the tortious conduct is generally foreseeable and a natural incident of the employment,' and the employee is acting in the scope of his employment." *House*, 2020 WL 6891830, at *22 (quoting *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999)).

Defendants' only response to this claim is that *respondeat superior* "is not an independent cause of action, but a theory that must attach to an underlying claim."  (MoL at 18 26 (quoting *Miller v. Cty. of Erie*, No. 17-CV-928, 2021 WL 4481195 at *9 (W.D.N.Y. Sept. 30, 2021)).)  Here, however, Plaintiff has adequately alleged state-law negligence claims against City employees relating to *non-retaliatory* denials of access to medical care and counsel.  Unlike the retaliation claims, these are plausibly within the scope of Defendant officers' employment. And, given Plaintiff's repeated attempts to notify high-level supervisors about his claims, it is

29

reasonable to infer that they were foreseeable. Absent any other arguments, the Court therefore declines to dismiss Plaintiff's claim against the City on a *respondeat superior* theory for Defendants' non-retaliatory but negligent conduct.

### 3. Supervisory Liability

The Court construes the Amended Complaint also asserting *individual* failure-to-supervise claims against Defendants Griffin, Cort, and Matos. (AC at 20.) Under New York law, "a supervisor will generally only be held liable for the actions of a subordinate where the supervisor directed or permitted the subordinate to act in a manner that created an unreasonable risk of harm." *Tabchouri v. Hard Eight Rest. Co., LLC*, 219 A.D.3d 528, 533 (2d Dep't 2023); *see also Ruggiero v. Miles*, 125 A.D.3d 1216, 1217 (3d Dep't 2015) (noting the "common-law rule . . . that a supervisor is liable if he directs or permits tortious conduct by those under his supervision or fails to exercise proper control over them." (internal quotation marks omitted)). Here, Plaintiff asserts that Defendants Griffin, Cort, and Matos are liable for *all* of the conduct of their subordinates. Such a broad claim clearly exceeds the scope of common-law liability. However, Plaintiff more narrowly alleges that Defendants Griffin and Cort were aware that Plaintiff was being denied access to counsel for retaliatory reasons, and either directed or permitted that conduct to continue. (AC ¶ 31-32; Opp. at 8.) Plaintiff also alleges that Matos was aware of and approved such denials based on her direct statements. (AC ¶ 24.)

Regarding Plaintiff's medical claims, Defendants Cort and Matos promulgated the CLO restricting Plaintiff's access to medical treatment, thereby directly creating the risk of harm. (Opp. at 4.) Plaintiff also alleges that Defendants Cort and Matos routinely toured the lockdown unit to monitor compliance with the CLO and disciplined subordinate officers who did not enforce it. (*Id.*) It is thus reasonable to infer that both Cort and Matos were aware of the CLO and directly responsible for the manner in which it was being implemented. Plaintiff does not

allege that Defendant Griffin was specifically aware of Plaintiff's medical issues, nor that any of the three Defendants were aware of the pepper spray incident.

Defendants do not specifically address these allegations in their briefing. Plaintiff's claims of individual supervisory liability must therefore be dismissed insofar as they assert blanket liability for all conduct by subordinate employees, but not to the extent that they are based on Defendants' actual knowledge and approval as described above. Accordingly, the motion to dismiss is granted as to Griffin with respect to all of Plaintiff's medical claims, and to Cort and Matos with respect to claims based on the pepper spray incident, but otherwise denied.

### F. Claims Under State Constitution

Plaintiff asserts a claim under New York State's constitutional guarantee of freedom of speech. *See* N.Y. Const. art 1, § 8. The Court construes this cause of action as a constitutional tort claim under state common law. While there is no statutory basis in New York for such a claim, the New York Court of Appeals has recognized the validity of "damage claims against the State based upon violations of the State Constitution." *Brown v. State*, 89 N.Y.2d 172, 183 (1996). "New York courts have [also] consistently accepted jurisdiction of such claims against individuals or corporations." *Id.* (internal quotation marks omitted).

"[Retaliation] claims under the First Amendment to the U.S. Constitution and Article I § 8 of the New York State Constitution are subject to the same analysis." *Almontaser v. New York City Dept. of Educ.*, No. 07-CV-10444, 2009 WL 2762699, at *2 n. 1 (S.D.N.Y. Sept. 1, 2009); *see also Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir.2006). Therefore, as with his First Amendment claims, Plaintiff has adequately pleaded his retaliation claims under the New York Constitution against Defendants Lindsey-Smith, Matos, Cort, Griffin, Rivera, and Phillips, as well as against the City based on the involvement of policymaking officials.

While New York courts will "only [infer] a private right of action under the state constitution where no alternative remedy is available to the plaintiff," *Ahmad v. New York City Health & Hosps. Corp.*, No. 20-CV-675, 2021 WL 1225875, at *35 (S.D.N.Y. Mar. 31, 2021) (quoting *Felmine v. City of New York*, No. 09-CV-3768, 2012 WL 1999863, at *6 (E.D.N.Y. June 4, 2012)), the Court recognizes that some of Plaintiff's other claims may fail later in these proceedings. The Court thus views Plaintiff's claims under the state constitution as pleaded in the alternative and declines to dismiss them at this time.

### G.    Claims Under Sections 1985 and 1986

Finally, Plaintiff alleges conspiracy claims under 42 U.S.C. §§ 1985 and 1986. To survive a motion to dismiss on a Section 1985 conspiracy claim, a plaintiff must plausibly allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087-88 (2d Cir. 1993) (citing *United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 828–29 (1983)). "Furthermore, the conspiracy must also be motivated by some racial or . . . otherwise class-based, invidious discriminatory animus." *Id.* at 1088 (internal quotation marks omitted).

Here, Plaintiff has failed to assert an underlying violation of the Equal Protection Clause. *See supra* § III.A.4. In addition, Plaintiff has not alleged any racial or class-based animus. The Court therefore dismisses Plaintiff's Section 1985 claims. Because Section 1986 does not provide an independent right of action and must be based on an underlying § 1985 claim, the Court dismisses Plaintiff's Section 1986 claims as well. *See Gagliardi v. Vill. of Pawling*, 18

F.3d 188, 194 (2d Cir. 1994) ("A claim under section 1986 . . . lies only if there is a viable conspiracy claim under section 1985.").

**IV.    Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part as explained in the foregoing opinion.

Regarding Plaintiff's Section 1983 claims based on conditions of confinement, the Motion is DENIED as to Defendants Cort, Matos, Phillips, and the City, and GRANTED as to all other Defendants.

Regarding Plaintiff's Section 1983 claims based on First Amendment retaliation, the Motion is DENIED as to Defendants Phillips, Griffin, Cort, Matos, Lindsey-Smith, and Rivera, and GRANTED as to all other Defendants.  The Motion is DENIED as to the City except with respect to Plaintiff's claims based on Defendant Phillips' conduct, as to which it is GRANTED.

Regarding Plaintiff's Section 1983 claims based on the Sixth Amendment, the Motion is DENIED as to Defendants Griffin, Cort, Matos, Lindsey-Smith, Rivera, and the City, and GRANTED as to all other Defendants.

Regarding Plaintiff's individual negligence claims under state law, the Motion is DENIED.

Regarding Plaintiff's intentional infliction of emotional distress claims under state law, the Motion is GRANTED.

Regarding Plaintiff's state-law claims against the City based on supervisory negligence and under a theory of *respondeat superior*, the Motion is DENIED.

Regarding Plaintiff's state-law vicarious negligence claims against Defendant Griffin, the Motion is DENIED with respect to Plaintiff's claims based on denial of access to counsel and GRANTED with respect to all other claims.  Regarding Plaintiff's state-law vicarious negligence

claims against Defendants Cort and Matos, the Motion is DENIED except with respect to the pepper spray incident, as to which it is GRANTED.

Regarding Plaintiffs' claims under the New York Constitution, the Motion is DENIED.

Regarding Plaintiff's conspiracy claims under Sections 1985 and 1986, the Motion is GRANTED.

Defendants shall file answers to the remaining claims within 14 days after the date of this opinion and order.

The Clerk of Court is directed to close the motion at Docket Number 31.

The Clerk of Court is directed to mail a copy of this opinion and order to the Plaintiff.

SO ORDERED.

Dated:  August 28, 2024
        New York, New York

_____
        J. PAUL OETKEN
    United States District Judge